UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DALLAS INDEPENDENT SCHOOL DISTRICT, | ) ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | |
| VS. | ) | 3:15-CV-1961-G |
| | ) | |
| MICHELLE WOODY, as next friend to K.W., | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION

### I. INTRODUCTION

This action was brought by the plaintiff, Dallas Independent School District

("DISD"), against the defendant, Michelle Woody ("Woody"), as next friend to

K.W. ("Kelsey"),[1] appealing the decision of the Texas Education Agency hearing

---

[1]     Under 34 C.F.R. § 300.520, Kelsey's identity was concealed before she reached the age of majority, which is 18 years of age in Texas.  19 TEX. ADMIN. CODE § 89.1049(a) (2007).  Kelsey reached 18 years of age on April 23, 2014.  Joint Exhibit ("JX") 1 at 000260.  Kelsey executed a statutory durable power of attorney form and a notice of transfer rights form appointing her mother, Woody, as her agent and durable power of attorney.  *See* Exhibits A-B to Response to Motion to Dismiss
(continued...)

officer in the administrative case labeled No. 052-SE-1014.[2]  Following a bench trial

on January 11, 2016, the court makes the following findings of fact and conclusions

of law.

## II.  FINDINGS OF FACT

1.     Throughout the 2013-2014 school year, Kelsey was a resident of DISD,

a political subdivision of the State of Texas and a duly incorporated school district.

Trial Transcript 26:21-25, 116:12-14.

2.     Kelsey graduated from high school on May 29, 2014, receiving her

diploma from the Winston School, a private school located within the geographical

boundaries of DISD.  JX 20 at 000553.

3.     In May 2012, Kelsey was first identified by the Los Angeles Unified

School District ("LAUSD") as eligible for special education and related services under

the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA").

At that time, LAUSD designated Kelsey as IDEA eligible, based on the Specific

---

[1](...continued)
for Lack of Jurisdiction at 000091-96.  Thus, Woody has the authority to act on
behalf of Kelsey under 20 U.S.C. § 1415(m)(2).  Additionally, now that Kelsey has
reached the age of majority, FED. R. CIV. P. 5.2 does not require the court to redact
court filings to protect Kelsey's identity.  *See* Trial Transcript 5:16-6:7.  Therefore,
the court refers to Kelsey by her name and not her initials, K.W., as used in the
administrative record.

[2]     Under 20 U.S.C. § 1415(i)(2)(C), the court received the record of the
administrative proceedings.

Learning Disability category, with severe discrepancies in the areas of math reasoning and reading comprehension.  JX 2 at 000296.

4.      For the 2013-2014 school year, DISD was Kelsey's resident district under the IDEA.  Trial Transcript 26:21-25, 116:12-14.

5.      Kelsey first presented with academic difficulties in preschool.  JX 23 at 000559.  At that time, she was diagnosed with ADHD and as being at risk for developing a language disorder and a dyslexic learning style.  *Id.* at 000561.

6.      Throughout Kelsey's elementary school years, she attended private schools that served students with disabilities where she received support for academics, social interactions, and ADHD.  *Id.* at 000560-61.  The evaluation data indicate continued concerns related to ADHD, reading, and oral and written expression.  *Id.*

7.      When Kelsey was eight years of age, her father died of colon cancer. Due Process Hearing Transcript ("Due Process T.") 39:13-15; Trial Transcript 11:1-4.  The family ultimately moved to Dallas, where Kelsey began sixth grade at a Dallas private school.  Due Process T. 41:25-42:6.  After sixth grade, Kelsey transferred to a Dallas private school, the Hockaday School ("Hockaday"), where she remained for seventh through ninth grades.  *Id.* at 42:7-13, 50:2-50:23.  Hockaday is a private college preparatory school that does not specifically serve students with disabilities. *Id.* at 49:11-50:21.

8.     While at Hockaday, Kelsey exhibited substantial deficiencies in her academic profile, leading the Hockaday headmaster to refer Kelsey for assessment. *Id.* at 42:14-17.  As a result, in January 2010, the Shelton Center formally evaluated Kelsey during her eighth grade year.  *Id.* at 43:4-49:9; Woody's Exhibit ("WX") 1 at 000577-88.  The Shelton Center evaluation found that Kelsey exhibited clear evidence of learning differences that required remediation and accommodations.  WX 1 at 000584-85.  Specifically, the evaluation found that Kelsey had a nonverbal learning disorder, not otherwise specified, and dysgraphia.  *Id.* at 000585.

9.     Following the Shelton Center evaluation, Hockaday referred Kelsey to the Winston School, a private school serving students with disabilities, but Kelsey declined to attend the Winston School.  Due Process T. 49:11-50:23.  Kelsey completed her ninth grade year at Hockaday despite the indications that Hockaday could not properly educate her.  *Id.*

10.     Following her ninth grade year, Kelsey moved to Los Angeles so that her mother, Woody, could complete an advanced degree at USC.  Trial Transcript 13:8-11.  For the fall semester of her tenth grade year (fall 2011), Kelsey attended the Brentwood Academy, a private college preparatory school in Los Angeles that does not provide services to students with disabilities.  Trial Transcript 13:11-14; Due Process T. 51:10-52:17.  Kelsey was wholly unsuccessful at Brentwood, both academically and socially.  Trial Transcript 13:11-14; Due Process T. 52:18-53:8.

- 4 -

11.     As a result of Kelsey's lack of success at Brentwood, Woody enrolled her in a LAUSD public school, University High School ("University"), for the spring semester of her tenth grade year.  Trial Transcript 13:15-21; Due Process T. 53:15-18.  Woody informed University about the Shelton Center evaluation and Kelsey's educational history.  Due Process T. 53:24-54:2.  In April 2012, LAUSD completed a comprehensive psychoeducational evaluation for Kelsey to determine if she was eligible to receive services under the IDEA categories of Learning Disability and/or Other Health Impairment for ADHD.  JX 1 at 000260.

12.     LAUSD's comprehensive evaluation of Kelsey found a discrepancy between her ability and achievement in the area of reading comprehension, with deficits also noted in math.  *Id.* at 000272-74.  The evaluation also found that Kelsey had ongoing attention problems, but concluded that her motivation and hard work prevented those problems from impacting her educational performance.  *Id.*  The evaluation recommended that Kelsey be referred to an Individual Education Program ("IEP") team to determine eligibility and program placement options, as well as continued implementation of her 504 plan and private counseling outside of school to manage anxiety and other emotional issues revealed by the assessment.  *Id.*

13.     The LAUSD conducted an Admission, Review, and Dismissal Committee ("ARDC") meeting on May 18, 2012 and concluded that Kelsey was eligible for services under IDEA based on the category of Specific Learning Disability.

JX 2 at 000296.  Woody concurred, but also believed that Kelsey's past designation of dysgraphia should be included and requested independent testing for dysgraphia, which was never completed.  *Id.* at 000292.  The ARDC developed an IEP for implementation with goals and objectives to address reading, math, and vocational education, and included instructional accommodations.  *Id.* at 000286-91.  The IEP designated general education as the instructional setting for Kelsey.  *Id.* at 000294.

14.     The May 2012 IEP was implemented for the remainder of Kelsey's tenth grade year (approximately one month) and Kelsey completed tenth grade with greater success.  Trial Transcript 15:22-16:3; Due Process T. 62:24-63:3.  Woody requested, and University agreed, that Kelsey take honors classes in her eleventh grade year.  Due Process T. 63:2-7.

15.     During the summer following tenth grade (2012), Kelsey traveled to South Korea to spend time with her older sister, who lived there.  Trial Transcript 16:24-17:1.  During her weeks in South Korea, Kelsey experienced significant emotional deterioration.  *Id.* at 17:2-6.  Kelsey had episodes of screaming and crying, having sensations that her body was burning when there was nothing physically wrong, running away, rocking, and being out of touch with reality.  *Id.*  Kelsey's sister sought medical attention for her while she was in South Korea and obtained mood-stabilizing medication for her.  *Id.* at 17:7-11; Due Process T. 64:4-65:14.

16.     Kelsey returned to Los Angeles and continued to demonstrate dramatic symptoms of an emotional breakdown despite mood stabilization medication, auditory hallucinations of command type, inability to participate in linear conversation, frequent bizarre responses, and elopement.  Due Process T. 66:2-19; WX 3 at 000593-95.  Kelsey was admitted to the adolescent unit of UCLA Psychiatric Hospital ("UCLA") on August 13, 2012.  WX 2 at 000589.  Kelsey's admitting diagnosis was "Psychosis not otherwise specified.  Rule out schizophrenia, disorganized type."  *Id.* at 000592.

17.     On August 22, 2012, Kelsey's attending psychiatrists at UCLA drafted a progress note concerning her condition and its implications for her upcoming eleventh grade year, the 2012-2013 school year.  WX 3 at 000593-95.  In relevant part, the report confirmed that Kelsey met diagnostic criteria for schizophrenia in addition to her previously diagnosed learning disabilities and attention problems.  *Id.* at 000594.  Due to the level of her functional impairment, the doctors stated that Kelsey required an increase in special education services in order to access the curriculum.  *Id.*  Specifically, they recommended that her school program include a "small, self-contained, specialized setting throughout her day where she can work within an adjusted curriculum and receive instructional supports and modifications in all subjects as well as therapeutic supports and close monitoring."  *Id.* at 000594.  In addition, they recommended counseling as a related service.  *Id.* at 000595.  Finally,

the recommendation stated that Kelsey may only be able to access her education in an instructional setting of a small self-contained campus (a non-public school setting) due to the severity of her psychotic disorder. *Id.*

18.    On August 30, 2012, UCLA Inpatient Hospital discharged Kelsey to her home and a partial hospitalization program that included day treatment and educational services in a highly structured, supervised, therapeutic milieu.  WX 4 at 000596-601.  Kelsey remained in the partial hospitalization program until her discharge on October 23, 2012.  WX 6 at 000604-06.

19.    On September 12, 2012, the UCLA psychiatrists treating Kelsey issued an update and addendum to their recommendations for her educational programming made on August 22, 2012.  WX 5 at 000602-03.  The addendum reported that Kelsey continued to be fragile and disorganized, easily overwhelmed by external stimuli, and impaired in her judgment.  *Id.* at 000602.  The recommendation indicated that her treatment team was seriously concerned about her ability to transition to and/or function in a general education environment given the pervasive nature of her psychiatric illness and her ongoing struggles even within the contained day treatment setting.  *Id.* at 000602-03.  Again, the recommendation was strongly made that upon discharge, Kelsey transition directly to a "small, highly-structured, contained specialized school setting with a therapeutic component and instructional

modifications. . . . [She] is far too fragile to be placed on a general education campus." *Id.*

20.     At the time of Kelsey's discharge on October 23, 2012, LAUSD offered only continued services for Kelsey in the general education setting at University or homeschooling despite the UCLA recommendations.  Due Process T. 73:3-74:15, 76:16-25; Trial Transcript 20:15-21.  Woody, knowing Kelsey could not return to University, moved Kelsey back to Dallas to live with her godparents, who could provide Kelsey with the necessary supports to transition out of the hospital setting. Due Process T. 77:1-79:6; Trial Transcript 21:6-11.  Woody remained a resident of Los Angeles throughout the 2012-2013 school year.  Due Process T. 77:11-20.

21.     In Dallas, Kelsey enrolled in the Winston School, a small, highly structured, specialized school that Woody believed could meet Kelsey's needs as identified by her psychiatrist's recommendations.  Trial Transcript 21:6-11, 23:2-14. The Winston School offers a learning environment for students with learning differences and challenges with very small classes, teaching methods focused on concrete experience, and extra supports.  Trial Transcript 23:2-14; Due Process T. 91:4-18.

22.     Kelsey made a positive transition to the Winston School and completed her eleventh grade year with A's and B's.  Due Process T. 90:2-11; JX 19 at 000552.

23.     In case of a repeated psychotic break, Kelsey's godmother, a psychiatrist, recommended that Kelsey develop a relationship with a Texas psychiatrist and be evaluated in Texas.  Due Process T. 81:11-23.  As a result, in January 2013, Children's Medical Center in Dallas ("Children's") evaluated Kelsey to provide diagnostic clarification and treatment recommendations.  WX 7 at 000608-17.

24.     The Children's evaluation found Kelsey to be very emotionally and psychologically sensitive and vulnerable.  *Id.* at 000616.  Children's recommended holding off on a final diagnosis of schizophrenia until Kelsey became older and diagnosed her with major depressive disorder in remission and psychotic disorder not otherwise specified.  *Id.* at 000616-17.  Children's noted a significant decline in overall intellectual functioning from her previous evaluation.  *Id.* 000616.  Children's recommended, in relevant part, continued follow-up with her psychiatrist for medication management, consistent structure with no significant life changes, and family and individual therapy.  *Id.* at 000617.

25.     Due to LAUSD's failure to offer Kelsey a placement other than a general education setting in her current placement, University (a public high school), for her eleventh grade year, Woody initiated a due process action against LAUSD.  WX 8 at 000618.  On April 10, 2013, LAUSD and Woody executed a settlement agreement and release in the then pending due process action, in which LAUSD agreed to

reimburse Woody for all educational costs associated with Kelsey's placement at the Winston School, plus counseling services. *Id.* at 000618-19.

26.     Also, LAUSD agreed to place Kelsey for the 2013-2014 school year at an appropriate non-public school ("NPS") certified by the California Department of Education and with a master contract with the LAUSD.  LAUSD also agreed to fund the placement once Kelsey was accepted as a student and to pay counseling for 60 minutes per week and transportation.  WX 8 at 000620.  LAUSD agreed to document the agreed placement for the 2013-2014 on Kelsey's IEP.  *Id.*  In the settlement agreement, the parties agreed that if Kelsey was not accepted into a NPS for any reason, that Kelsey's placement for 2013-2014 would be the placement and IEP set forth in Kelsey's May 2012 IEP, University High School general education curriculum and setting.  *Id.*

27.     On May 14, 2013, toward the end of Kelsey's eleventh grade year, her IEP team from LAUSD convened an ARDC to develop her IEP for senior year, the 2013-2014 school year.  JX 3 at 000304.  Because Kelsey had been attending the Winston School during her eleventh grade year, LAUSD had no achievement data on her IEP goals and objectives, and no information concerning present levels of performance, even though LAUSD had the contractual right to obtain the information from the Winston School.  WX 8 at 000619; JX 3 at 000305-10.  The ARDC committee continued Kelsey's eligibility based on a specific learning disability

and developed an IEP for her senior year year that included general education curriculum, 1570 minutes per week in a special education setting at a California NPS (Westview School), transportation and 240 minutes per month of counseling as a related service.  JX 3 at 000318-20.  The IEP contains no measurable annual goals and objectives, no present levels of academic functional performance, and it is unclear if LAUSD followed IDEA requirements.  JX 3; Trial Transcript 26:4-16.

28.     Though not mentioned in the settlement document or the May 2013 IEP, Woody "worked out with" LAUSD that the parties would substitute the Winston School for Westview and that LAUSD would pay the tuition at the Winston School for the 2013-2014 school year.  Due Process T. 80:6-16, 224:3-10; Trial Transcript 25:17-26:3; DISD Exhibits ("DXs") 53-54 at 001004-06.

29.     Woody waived the statutory notice of the IEP team meeting and the presence of IEP team members who might otherwise be required to attend.  JX 3 at 000321.

30.     Westview, the non-public school identified in Kelsey's IEP for her senior year, is a California non-public school that offers a smaller educational environment for students with learning disabilities and behavioral issues.  Due Process T. 79:17-80:2.

31.     The Winston School and Westview are both educational environments designed to serve students with disabilities in a smaller learning environment with

supports, and services designed to assist students with disabilities.  *Id.*  Westview, unlike the Winston School, must meet certain certification requirements prescribed by the California legislature and Department of Education and has the same reporting and assessment requirements as all other public schools in California.  WX 8 at 000620.

32.    At the outset and throughout her senior year, Kelsey continued to be very disorganized, to have difficulty following basic instruction, to have difficulty managing simple tasks of daily living, and to require tremendous oversight and supervision.  Due Process T. 100:1-15.  Kelsey could not be left alone in her home and was unable to maintain a job.  *Id.*  During the summer, Kelsey did, however, successfully travel to South Korea by herself to again stay with her sister, and attended a multi-week program at USC with some parental oversight and supervision.  Due Process T. 247:2-249:4; Trial Transcript 116:5-14; DX 57 at 001010.

33.    On August 26, 2013, Kelsey began her senior year at the Winston School.  Final Decision of Hearing Officer ("FDHO") ¶ 33; WX 45 at 00836.  In July 2013, Woody leased an apartment in Dallas.  Trial Transcript 157:2-6; DX 57 at 001010.  In August 2013, Woody relocated from Los Angeles to Dallas.  Trial Transcript 26:21-25.  As a result, Kelsey became a resident of DISD in August 2013. *Id.*

34.    On September 19, 2013, Woody, through her attorney, notified DISD by letter dated September 16, 2013, of Kelsey's residence in DISD and her desire to receive a free appropriate public education ("FAPE") in the form of tuition reimbursement from DISD, which Woody deemed comparable to the terms of Kelsey's senior year IEP from LAUSD.  FDHO ¶ 34; JX 5 at 000328.  In connection with the request for placement at the Winston School, Woody provided DISD with the LAUSD IEP from May 2013 that placed Kelsey in a nonpublic school for her senior year, the Children's evaluation from January 2013, and background information concerning Kelsey's psychosis.  JX 5; Trial Transcript 27:13-18.

35.    In the letter to DISD, Woody asked DISD to provide her with whatever forms were necessary to allow reimbursement for the expenses associated with Kelsey's attendance at the Winston School.  JX 5 at 000328.

36.    Woody did not enroll Kelsey in DISD because Kelsey's IEP provided for placement in a non-public school and, based on doctor's recommendations, she believed it would be catastrophic for Kelsey's health based on doctors' recommendations.  Due Process T. 240:10-245:13.  The record is clear that Woody believed it critical for Kelsey to remain at the Winston School and intended, from the beginning, to pursue funding for her tuition from DISD.  JX 5 at 000328; DX 58 at 001012; Due Process T. 241:13-19.

37.     On October 4, 2013, DISD responded, through its attorney, requesting additional information to assist the DISD in determining the appropriate placement and provision of services for Kelsey.  JX 6 at 000360.  Specifically, DISD requested the complete ARDC (also referred to as "IEP team" in California) document from 2012, the most recent LAUSD Full and Individual Evaluation ("FIE"), and all educational records from the Winston School.  *Id.*  DISD informed Woody that once the records were reviewed, DISD would schedule an ARDC.  *Id.*

38.     Woody required that all communication between DISD and the Winston School be coordinated through Woody's attorney.  DX 61 at 001019. DISD found this limitation frustrating and tedious.  Due Process T. 317:17-320:25; 486:18-487:15.

39.     Woody immediately responded to DISD's request for documentation, and asked the Winston School for records.  Due Process T. 111:21-112:18; DX 58 at 0001012.  Even so, it took until November 5, 2013, JX 7 at 00361, for Woody to provide the requested documents to DISD because the Winston School had to complete forms reporting Student's Present Levels of Academic Achievement and Fundamental Performance ("PLAAFP").  JX 10 at 000386-95.  The forms were unfamiliar to the Winston School staff.  Due Process T. 114:11-19, 330:5-18, 337:11-15.

40.     On November 13, 2013, DISD requested consent from Woody to obtain records from LAUSD.  DX 62 at 001020.  On November 19, 2013, Woody provided the requested consent.  WX 13 at 000634-35; Trial Transcript 29:1-4.

41.     On November 18, 2013, DISD contacted Woody to schedule an ARDC meeting.  DX 63 at 001024.  DISD proposed three dates in December and ultimately, the parties agreed to conduct the ARDC meeting on December 17, 2013. *Id.*; Due Process T. 115:13-116:6.

42.     DISD requested that personnel from the Winston School attend the ARDC meeting, pursuant to the requirements of 20 U.S.C.A. § 1414(d)(1)(B).  WX 12 at 000632.  However, a conflict developed because of the Winston School's policy of requiring payment for the time of staff to attend the meeting.  WX 17 at 000640. As neither party was willing to pay the Winston School staff, Kelsey's teachers from Winston did not attend the December 2013 meeting.  JX 8 at 000376; DX 66 at 001034; Trial Transcript 29:9-30:16.  By November 22, 2013, Woody was in possession of this policy statement, DX 67 at 001036-37, but did not inform DISD of its existence until December 13, 2013.  WX 16 at 000638.

43.     Immediately preceding the December 17, 2013 meeting, emails amongst DISD staff indicate confusion as to whether the meeting was to be an ARDC meeting or a transfer meeting to document comparable services to be provided to the student. DXs 59 at 001014-16, 65 at 001031-33, 68 at 001038-40; Due Process T. 370:8-

372:22, 374:3-376:19; Trial Transcript 30:17-24.  The emails clearly indicate DISD's knowledge that Kelsey was "placed at a private school as a means of completing the California school district's obligation for the IEP services."  DX 68 at 001038 ("The student is supposedly transferring into this district from a district out of state during the school year.").

44.     Woody arrived at the December 17, 2013 meeting under the impression that she was attending an ARDC meeting, as described in previous correspondence. JXs 6-7 at 000360-62; Trial Transcript 30:25-31:5.  Upon arrival, she was told the meeting was a "student transfer meeting."  Due Process T. 134:4-24; Trial Transcript 30:25-31:5; JX 8 at 000375.  The stated purpose of the meeting, per DISD, was "to document a student transfer into the district and plan for comparable services."  JX 8 at 000363.  The transfer document provides that "[Kelsey] will receive special education services on a temporary basis."  *Id.* at 000364.  No temporary special education services, however, were offered or provided.  Trial Transcript 31:10-13; JX 8 at 000368, 000375.  The document then notes that Kelsey's eligibility for services had been verified by both Woody's statement and documentation from LAUSD and Children's.  *Id.* at 000364.  Finally, the documentation notes that the services provided by the former school were "unclear."  *Id.*

45.     The transfer committee found that Kelsey had a disability (specific learning disability), an educational need for special education and related services,

and met eligibility criteria to receive services under IDEA.  *Id.* at 000365.  However, Hannifah Giles, a DISD representative, testified that it was DISD's view that Kelsey was "not eligible to receive special education services" under IDEA and that DISD needed to see if there was an educational need.  Due Process T. 397:24-399:20.  The transfer meeting document indicates that the committee believed additional evaluation was needed and that temporary services would be provided.  *Id.* at 000365, 000375.

46.    Confusingly, the transfer document is completed with boxes checked designating that Kelsey is a "parentally placed child with disability in private school" who "declines enrollment in home LEA."  *Id.* at 000365.  The box is not checked next to the statement, "Parent declines enrollment in Dallas ISD and FAPE."  *Id.*  DISD understood that Woody sought an offer of FAPE from DISD, but DISD did not make an explicit offer of FAPE to Woody.  *Id.*; Due Process T. 283:23-284:5; Trial Transcript 67:2-20.

47.    Although the transfer meeting documentation reflects that temporary special education will be provided, the committee did not develop goals and objectives but declared that Kelsey would master all of the Texas Essential Knowledge and Skills ("TEKS") objectives at her grade level in a "mainstream" setting.  JX 8 at 000373, 000375.

48.     The minutes of the December 2013 meeting indicate that DISD would reevaluate Kelsey and develop a plan to provide FAPE.  *Id.* at 000375.  DISD rejected Kelsey's IEP from LAUSD because (1) there was no disability documented in the FIE; (2) the goal statements were not measurable; and (3) the appropriate ARDC members did not sign in agreement to the ARDC meeting.  *Id.*; Due Process T. 385:7-388:4; Trial Transcript 119:6-120:20.  The committee recommended a re-evaluation to provide a complete and current picture of Kelsey's eligibility for services.  JX 8 at 000375; Trial Transcript 34:16-24.

49.     As of the December 2013 transfer meeting, DISD was aware of the Children's medical evaluation, Kelsey's hospitalization at UCLA, her diagnosis of schizophrenia, and the recommended need for stability in her placement.  Due Process T. 140:8-141:3, 388:5-394:23.  Despite the findings on 000365 of the transfer document, DISD did not offer Kelsey temporary placement at the Winston School, or a FAPE of any services at a DISD public school, while DISD completed its re-evaluation. *See generally* JX 8; Due Process T. 283:23-284:5; Trial Transcript 34:16-24.

50.     As of December 17, 2013, DISD found that Kelsey was IDEA eligible but determined that the educational need for special education services was unclear. JX 8; Due Process T. 397:24-399:21; Trial Transcript 97:14-18, 182:10-183:8.

51.     Following the transfer meeting in December 2013, DISD sought and obtained consent to evaluate Kelsey.  Trial Transcript 36:9-20; Due Process T. 231:2-11.  Due to the adversarial context surrounding the evaluation, several disputes erupted concerning the evaluation process, including a due process proceeding initiated by DISD complaining of Woody's attorney controlling the flow of information between DISD and the Winston School.  WX 26 at 000658; Due Process T. 149:9-25.

52.     DISD's FIE of Kelsey was completed by Dr. Laura Darby, a licensed specialist in school psychology ("LSSP") employed by DISD.  JX 11 at 000396-431; DX 36 at 000936-38.  In completing the FIE, Dr. Darby reviewed Kelsey's records from LAUSD, UCLA, Children's, and the Winston School.  Trial Transcript 39:15-19.  Dr. Darby did not observe Kelsey at the Winston School or complete formal testing for adaptive behavior.  Trial Transcript 38:24-39:9; Due Process T. 432:9-25; JX 11 at 000421.  Dr. Darby did not discuss or document the environment at the Winston School in her FIE, such as the small class size, structured learning environment, or extensive supports provided to students.  Trial Transcript 40:25-41:5; Due Process T. 454:20-23; *see generally* JX 11.

53.     Dr. Darby concluded that Kelsey demonstrated symptoms consistent with the IDEA eligibility criteria for an emotional disturbance based on inappropriate behaviors or feelings under normal circumstances, a general pervasive mood of

unhappiness or depression, and a tendency to develop physical symptoms or fears associated with personal or school problems.  JX 11 at 000422; WX 32 at 000692; Due Process T. 434:18-435:11.

54.     Dr. Darby also concluded that Kelsey did not meet the diagnostic criteria as a student with a learning disability, although she documented that Kelsey demonstrated deficits in reading comprehension, math reasoning, and written expression along with a pattern of strengths and weaknesses in her cognitive profile, with deficits noted in her ability to reason, process visual information, use associational memory, and overall general knowledge.  Due Process T. 456:14-457:12; JX 11 at 000419.  Dr. Darby attributed Kelsey's academic deficits to both her cognitive processing and emotional disturbance.  Due Process T. 456:14-457:12.

55.     In Dr. Darby's initial FIE report, provided to Woody on April 8, 2014, Dr. Darby found Kelsey IDEA eligible based on her emotional disturbance.  WX 32 at 000701; Due Process T. 487:11-21; Trial Transcript 39:20-22.  However, the narrative in Dr. Darby's initial FIE report stated: "Although Kelsey does meet diagnostic criteria as a child with an emotional disturbance, she does not demonstrate a need for services that can only be provided through special education."  WX 32 at 000692; JX 11 at 000422; Due Process T. 487:11-21; Trial Transcript 103:10-19. The narrative did not change between April 8, 2014 and April 16, 2014.  WX 32 at 000692; JX 11 at 000422; Due Process T. 487:11-21; Trial Transcript 103:10-19.

56.     Subsequently, on April 16, 2014, DISD provided Woody with a revised copy of the FIE, with a cover email indicating a "clerical error" had been made in the original report.  WX 33 at 000702.  In the revised FIE, Dr. Darby concluded that Kelsey was not IDEA eligible because she had not demonstrated educational need for special education services.  JX 11 at 000431.  Dr. Darby's conclusion was based on Kelsey performing successfully in her "mainstream" environment at the Winston School.  JX 11 at 000412; Trial Transcript 40:22-41:5; Due Process T. 435:8-436:3.

57.     In her FIE, Dr. Darby did not note the cautionary recommendation from Children's that any significant life change could place Kelsey at significant risk for a relapse of psychosis.  *See generally* JX 11.  Dr. Darby viewed the Children's recommendation as significant and concurred that changing Kelsey from the Winston School to North Dallas High School would constitute a significant life event.  Trial Transcript 41:6-12; Due Process T. 430:8-432:8.  However, she did not bring this to the attention of the ARDC when her FIE was reviewed or when Kelsey's IEP was developed.  Trial Transcript 41:6-12; Due Process T. 430:8-432:8.

58.     On April 24, 2014, the initial ARDC meeting to review DISD's FIE and discuss the provision of a FAPE for Kelsey convened at the Winston School.  Trial Transcript 40:4-12; Due Process T. 162:4-10; JX 13 at 000435.

59.     The ARDC reviewed Dr. Darby's FIE, including information concerning Kelsey's performance at the Winston School.  JX 13 at 000468-69.  The ARDC

members were not able to reach a consensus, as DISD concluded that Kelsey did not require special education services -- despite her designation as meeting criteria for an emotional disturbance -- based on its belief that Kelsey had been successful in a mainstream environment at the Winston School and was on track to graduate in May 2014. *Id.*; Due Process T. 261:8-10, 340:14-343:9.

60.     At the conclusion of the ARDC meeting, Woody disagreed with the FIE results and the ARDC's conclusion, and asked for an Independent Educational Evaluation ("IEE") of Kelsey. JX 13 at 000468-71. DISD denied the request for an IEE and the ARDC was scheduled to reconvene on May 22, 2014. *Id.* at 000469; Due Process T. 177:4-178:10.

61.     In between the initial ARDC meeting and the reconvened meeting, Woody retained Dr. Denise McCallon, a private LSSP, to provide a psychological consultation concerning Kelsey. Due Process T. 178:14-179:8. Specifically, Dr. McCallon was asked to review DISD's FIE and opine about its conclusion that Kelsey did not meet an IDEA eligibility criteria due to a lack of educational need. JX 16 at 00538. DISD received Dr. McCallon's report on May 20, 2014. *Id.*; Due Process T. 178:18-183:18.

62.     To complete her consultation, Dr. McCallon observed Kelsey at school for several hours in three different classes and reviewed Kelsey's prior medical and educational records. JX 16 at 000538-41; Due Process T. 289:6-294:21.

63.     Dr. McCallon concluded that DISD's FIE failed to consider significant information about Kelsey that resulted in the improper conclusion that she did not need special education services in order to receive a FAPE.  JX 16 at 000541. Specifically, Dr. McCallon emphasized the FIE's failure to describe the environment at the Winston School and understand the impact of that environment on Kelsey's ability to be successful.  *Id.*  Dr. McCallon pointed out that the description of the Winston School as a "mainstream setting" was wholly inaccurate.  *Id.*

64.     Dr. McCallon also noted that Dr. Darby did not observe Kelsey in a classroom setting or complete formal testing for adaptive functioning when completing her FIE, both of which led to the inaccurate conclusion that Kelsey could function at a higher level without supports.  *Id.*; Due Process T. 289:8-21.

65.     Dr. McCallon concluded that Kelsey continued to experience a cognitive decline resulting from her psychotic break, with particular cognitive deficits in the areas of math and reading comprehension.  JX 16 at 000541.  Dr. McCallon believed that Kelsey continued to need a very structured, predictable, quiet and safe environment and she concurred with the Children's evaluation that Kelsey remained vulnerable to a psychotic relapse.  *Id.*  Dr. McCallon ultimately concluded, "A change of schools for her senior year would almost certainly have been devastating."  *Id.* at 000541-42; Due Process T. 294:10-21.

66.     Dr. McCallon further concluded that Kelsey demonstrated a need for special education services and that the Winston School was an appropriate placement for Kelsey.  Due Process T. 299:24-300:2; 309:23-310:20; Trial Transcript 54:17-24.

67.     In part as a result of Dr. McCallon's report, Dr. Darby and other DISD members of the ARDC became aware that the Winston School was not a "mainstream environment" and decided that Kelsey required special education services as a result of her emotional disturbance and its impact on her cognitive and academic abilities.  JX 13 at 000469; Due Process T. 466:19-468:6.  At the ARDC meeting on May 22, 2014, the ARDC determined that Kelsey was IDEA eligible for special education and related services and developed an IEP for Kelsey to be implemented at North Dallas High School.  JX 13 at 000469; Due Process T. 466:19-468:6.

68.     As of May 22, 2014, Kelsey had completed her course work and exams at the Winston School and was prepared to graduate on May 29, 2014.  Due Process T. 184:18-185:8; Trial Transcript 73:25-74:4.

69.     The May 22, 2014 ARDC reviewed Kelsey's PLAAFPs and developed goals and objectives related to the remaining activities of the school year, setting the start date for the IEP as April 24, 2014 and the end date as April 24, 2015.  JX 13 at 000448; Trial Transcript 46:2-7, 130:13-131:8.  The proposed IEP contained two

annual goals, one related to organizational skills and the other to self-regulating skills. JX 13 at 000448-49.

70.     The proposed IEP contained academic accommodations and supports, as well as behavior support in the form of a cool down time/area and access to a designated trained adult to guide Kelsey through calming procedures.  JX 13 at 000450.

71.     The schedule of services was 150 minutes per week per core subject in a special education setting and 60 minutes per week of personal social development in a special education setting.  *Id.* at 000458.  The remainder of Kelsey's time was in the general education environment with in-class support.  *Id.*  As reflected on Kelsey's proposed IEP, the total number of minutes she was to be in special education was 660, while spending 1440 minutes in general education.  *Id.*

72.     Kelsey's proposed IEP noted Kelsey was receiving psychological services and recommended a continuation.  JX 13 at 000461.

73.     DISD proposed to implement Kelsey's IEP at North Dallas High School.  JX 13 at 000471; Due Process T. 189:23-192:8.  When Woody disagreed with the proposed placement, DISD suggested that Woody observe the environment at Hillcrest High School.  JX 13 at 000471; Due Process T. 189:23-192:8; Trial Transcript 47:6-12.

74.     The ARDC ended in disagreement.  JX 13 at 000488-89.  Woody continued to seek DISD's funding of Kelsey's placement at the Winston School during her senior year, while DISD proposed the IEP described herein.  *Id.*

75.     Although Woody viewed DISD's attempt to design an IEP for Kelsey after she had completed the graduation requirements for high school and had only one week before graduation as futile, Woody fully participated in the process of developing the proposed IEP, providing meaningful information about Kelsey and contributing to the design of proposed goals and objectives.  *See generally* JX 13.

76.     At the conclusion of the May 22, 2014 ARDC meeting, Woody objected to DISD's proposed IEP for Kelsey on several grounds; (1) the proposed IEP was offered after Kelsey had completed the requirements to graduate high school and only one week before her scheduled graduation form the Winston School; (2) the IEP included inadequate services and supports to address Kelsey's emotional needs; (3) the goals and objectives contained procedural irregularities and inaccuracies and failed to address Kelsey's academic or emotional deficits; and (4) the placement of Kelsey at North Dallas High School or Hillcrest for the last week of high school.  JX 13 at 000485-89; Due Process T. 188:15-192:8; Trial Transcript 46:23-47:12, 50:17-51:18.

77.     DISD's proposed IEP, offered on May 22, 2014, was DISD's first offer of FAPE to Kelsey, even though the IEP offered was never finalized.  JX 13 at 000471

("We can provide services at a Dallas ISD campus."); Due Process T. 190:4-192:8;

Trial Transcript 34:20-24, 56:24-57:3, 67:25-68:4, 83:18-24, 153:5-8.

78.     On August 1, 2014, DISD completed the final ARDC document from

the April and May 2014 ARDC meetings and provided it to Woody.  WX 39 at

000773; Due Process T. 162:4-16.

79.     At the conclusion of the May ARDC meeting, Woody renewed her

request for an IEE which DISD agreed to conduct at DISD's expense.  JX 13 at

000488-89; JX 22 at 000555.  Woody communicated with DISD about who would

do the evaluation and DISD agreed to have Dr. McCallon do the evaluation.  WX 38

at 000771, Trial Transcript 48:9-13.  In August 2014, Dr. McCallon tested Kelsey

and completed a report.  JX 23 at 000557-71; Trial Transcript 48:14-18.  Dr.

McCallon diagnosed Kelsey with schizophrenia, ADHD and dysgraphia, and

expressed the opinion that moving Kelsey to another school during her senior would

have been a disaster.  JX 23 at 000569-70; Trial Transcript 48:14-49:19.

80.     After Dr. McCallon distributed the report, DISD contacted Woody to

ensure she had received a copy.  WXs 40-41 at 000774-89; Trial Transcript 49:20-

24.  Woody confirmed that she received the report.  Trial Transcript 49:23-24.

81.     DISD never reconvened the ARDC meeting to consider Dr. McCallon's

IEE.  Trial Transcript 49:25-50:16; Due Process T. 162:4-163:1 .  DISD never

finalized the May 2014 IEP, thereby never finalizing its offer of FAPE.  Trial

Transcript 165:4-166:20.  DISD did not communicate its intent not to reconvene the ARDC meeting.  Trial Transcript 165:4-166:20; Due Process T. 30:13-31:1, 162:11-163:1, 202:19-203:3.  In October 2014, Woody filed a request for a due process hearing, the findings from which are on review before the court.  Trial Transcript 50:14-16.

82.     During her senior year, Kelsey applied to college, but was not accepted at any of the colleges to which she applied.  Due Process T. 23:7-16, 93:10-94:13. She decided to enroll at El Centro Community College, in Dallas, to navigate the transition to college life.  Due Process T. 94:4-13.  During summer 2014, she enrolled in summer school and was successful in her classes with very extensive support from Woody.  Due Process T. 94:12-25.

83.     During fall semester 2014, Kelsey was not able to successfully complete the semester without the special education supports she had received at the Winston School.  Due Process T. 95:1-97:7.  Kelsey received two D's, one A, and an incomplete.  WX 47 at 000854; Due Process T. 95:1-97:7.

84.     The proposed IEP, offered by DISD to Kelsey at the May 22, 2014 ARDC meeting, did not provide Kelsey with a timely offer of FAPE.  Trial Transcript 52:18-53:7, 69:11-70:13.  DISD never offered Kelsey any FAPE covering the period from May 14, 2013, or September 19, 2013, until April 24, 2014.  JX 13 at 000448;

Trial Transcript 56:24-57:3, 67:2-20.  DISD's proposed May 2014 IEP offered FAPE from April 24, 2014 until April 24, 2015.  JX 13 at 000448.

85.     Kelsey never enrolled in DISD.  Trial Transcript 61:5-21; 104:2-3, 183:9-18; Due Process T. 240:10-11.  From fall 2012 until her graduation on May 29, 2014, with an unrestricted diploma, Kelsey was enrolled, without interruption, at the Winston School.  JXs 19-20 at 000552-53; Trial Transcript 21:6-24:4; Due Process T. 76:8-77:9.

86.     The tuition for the Winston School for the 2013-2014 school year was $28,885.00.  JX 4 at 000326; WX 52 at 000871-73.  Woody paid the Winston School the sum of $23,885.00, as she received a $5000 financial aid credit form the school.  WX 52 at 000871-73; Due Process T. 203:18-204:6.

87.     Transportation costs associated with Kelsey's attendance at the Winston School for the 2013-2014 school year totaled $1,541.93.  WX 50 at 000868; Due Process T. 204:7-207:15.

88.     During the 2013-2014 school year, Woody obtained services from Dr. David Henderson, M.D., a psychiatrist, primarily for medication management in the amount of $825.00.  WX 51 at 000870; Due Process T. 207:16-208:9.

89.     Pursuant to the provisions of the LAUSD May 2013 IEP and as compensatory services, Woody seeks counseling services for 240 minutes per month

at the rate of $300.00 per hour until the age of 21 years, for a total of $42,000.00.
JX 3 at 000311; Due Process T. 208:10-210:6.

90.     DISD is an independent school district duly constituted in and by the
state of Texas, and subject to the requirements of the IDEA and its implementing
federal and state regulations.  DISD had the legal obligation to offer FAPE to Kelsey.
34 C.F.R. § 300.101(a).

91.     The hearing officer concluded that DISD "had the legal obligation to
make FAPE available to [Kelsey]. 34 C.F.R. § 300.101."  FDHO at 000029.  Next,
the hearing officer concluded that DISD "failed to timely offer an educational
program to [Kelsey] that was reasonably calculated to provide her with a free
appropriate public education for the 2013-2014 school year.  34 C.F.R. § 300.323;
34 C.F.R. § 300.111; 34 C.F.R. § 300.19 T.A.C. § 89.1096."  *Id.*  The hearing officer
concluded that Woody is "entitled to reimbursement for the out of pocket cost to
[Kelsey]'s family for the tuition of private school, plus transportation, for the 2013-
2014 school year," and that the tuition reimbursement "is not to be reduced or
denied based on equitable considerations."  *Id.* (citing 34 C.F.R. § 300.148).  The
hearing officer ordered DISD to reimburse Woody for tuition and transportation in
the amount of $25,426.93.  *Id.* at 000030.

III.  ANALYSIS

A.  Legal Standards

1.  *Standard of Review*

Parents aggrieved by a local education agency ("LEA")'s decision regarding the provision of a FAPE are entitled to an impartial due process hearing, *see* 20 U.S.C. § 1415(f)(1), and parties aggrieved by the administrative decision resulting from this hearing may file suit in federal district court, *see* 20 U.S.C. § 1415(i)(2)(A).

"Although the district court must accord 'due weight' to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence." *Cypress-Fairbanks Independent School District v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997) (quoting *Board of Education of the Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176, 206 (1982)), *cert. denied*, 522 U.S. 1047 (1998).  Thus, the district court's review of the special hearing officer's recommendation is "virtually de novo." *Klein Independent School District v. Hovem*, 690 F.3d 390, 394 (5th Cir. 2012), *cert. denied*, __ U.S. __, 133 S. Ct. 1600 (2013) (internal quotations omitted).  The burden of proof is on the party challenging the IEP, in this case, the defendant Woody, to show why the IEP and resulting placement were inappropriate under the IDEA.  *Houston Independent School District v. Bobby R.*, 200 F.3d 341, 347 (5th Cir.), *cert. denied*, 531 U.S. 817 (2000).  The court's task "is not to second-guess state and local policy decisions;

rather, it is the narrow one of determining whether state and local school officials have complied with the [IDEA]." *Daniel R.R. v. State Board of Education*, 874 F.2d 1036, 1048 (5th Cir. 1989).

## 2.  *IDEA Statutory Framework*

In order to receive federal funding, IDEA requires states to provide all children with disabilities residing within the state with a "[FAPE]."  20 U.S.C. § 1412(a)(1)(A); *Forest Grove School District v. T.A.*, 557 U.S. 230, 246 (2009).  FAPE "must be available to all children residing in the State between the ages of 3 and 21 . . . ."  34 C.F.R. § 300.101(a).  To ensure that all children receive a meaningful opportunity to benefit from public education, the education of children with disabilities must be tailored to the unique needs of the handicapped child by means of an IEP.  *Richardson Independent School District v. Michael Z.*, 580 F.3d 286, 292 (5th Cir. 2009); 20 U.S.C. § 1414(d).

In Texas, in order to provide a FAPE to a student with a disability, an ARDC must tailor the student's education to his or her handicapped needs by developing an IEP.  *Teague Independent School District v. Todd L.*, 999 F.2d 127, 128 (5th Cir. 1993); *R.P. ex rel. R.P. v. Alamo Heights Independent School District*, 703 F.3d 801, 805 n.1 (5th Cir. 2012).  The IEP includes a statement of the special education, related services and accommodations the school will provide to the child.  *See* 20 U.S.C. § 1414(d)(1)(A).  The IDEA guarantees only a "basic floor of opportunity" for every

disabled child, consisting of "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201.  The IDEA mandates annual review of a student's IEP.  20 U.S.C. § 1414(d)(4)(A)(i); *see also* 34 C.F.R. § 300.324(b)(1)(i).  "At the beginning of each school year, each public agency must have in effect, for each child with a disability within its jurisdiction, an IEP, as defined in § 300.320."  34 C.F.R. § 300.323(a).

The IDEA requires any state or LEA receiving funds under the IDEA to "establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies."  20 U.S.C. § 1415(a); *C.C. v. Hurst-Euless-Bedford Independent School District*, No. 4:14-CV-1042-A, 2015 WL 2443835, at *2 (N.D. Tex. May 21, 2015) (McBryde, J.).  Such procedural safeguards include allowing parents to play a significant role in the development of an IEP.  See *Winkelman ex rel. Winkelman v. Parma City School District*, 550 U.S. 516, 524 (2007).

A school district may violate the IDEA in two different ways.  "First, a school district, in creating and implementing the IEP, can run afoul of the [IDEA]'s procedural requirements."  *J.W. ex rel. J.E.W. v. Fresno Unified School District*, 626 F.3d 431, 432 (9th Cir. 2010) (citing *Rowley*, 458 U.S. at 206-07).  "Second, a school

district can be liable for a substantive violation of the IDEA by drafting an IEP that is not reasonably calculated to enable the child to receive educational benefits." *Id.*; see also *Adam J. ex rel. Robert J. v. Keller Independent School District*, 328 F.3d 804, 809 (5th Cir. 2003). "Harmless procedural errors do not constitute a denial of FAPE. However, procedural inadequacies that result in the loss of educational opportunity . . . clearly result in the denial of FAPE." *Doug C. v. Hawaii Department of Education*, 720 F.3d 1038, 1043 (9th Cir. 2013) (internal quotations omitted); see also *Adam J. ex rel. Robert J.*, 328 F.3d at 812.

### a.  Transfer Student from Another State

The IDEA sets forth a school district's obligations to a student with an existing IEP who transfers from another state within the same academic year.  *See* 20 U.S.C. § 1414(d)(2)(C)(i)(II).  "If a child with a disability (who had an IEP that was in effect in a previous public agency in another State) transfers to a public agency in a new State, and enrolls in a new school within the same school year," the new school district must provide the student with "services comparable to those described in the child's IEP from the previous public agency" until the school district conducts an evaluation, if the district determines such an evaluation is necessary, and develops a new IEP, if appropriate.  34 C.F.R. § 300.323(f); *see also* 19 TEX. ADMIN. CODE § 89.1050 (j)(2).

b.  Parentally Placed Student in Private School

When a child with a disability is enrolled by his or her parents "directly in a private school or facility" and is referred to a local school district, the local district "shall convene an [ARDC] meeting to determine whether the district can offer the student a [FAPE]."  19 TEX. ADMIN. CODE § 89.1096(b); 34 C.F.R. § 300.130.  If the local district determines that it can offer a FAPE to the student, the district is not responsible for providing educational services to the student, except as provided in 34 C.F.R. §§ 300.130-300.144.  *Michael Z.*, 580 F.3d at 295 (citing *Florence County School District Four v. Carter By & Through Carter*, 510 U.S. 7, 15 (1993)).

When a parent or guardian challenges the appropriateness of an IEP crafted by a state or local education agency and the resulting educational placement, a reviewing court's inquiry is generally twofold.  *Michael F.*, 118 F.3d at 248.  The court must ask first whether the state or local agency complied with the procedures set forth in the IDEA, and if so whether the IEP developed through the IDEA's procedures was reasonably calculated to enable the child to receive educational benefits.  *School Committee of the Town of Burlington, Massachusetts v. Department of Education of Massachusetts*, 471 U.S. 359, 370 (1985).  In those instances when a suitable or "appropriate" public educational placement is not available for a disabled child within a state or local school district, the district must pay the costs of sending the child to

an appropriate private institution. *Id.* at 369-70; *Alamo Heights Independent School District v. State Board of Education*, 790 F.2d 1153, 1160-61 (5th Cir. 1986).

The court may, "in the exercise of the equitable authority granted to it under the IDEA, order public school authorities to reimburse parents or guardians of a disabled child for their expenditures on private schooling when they unilaterally remove the child from public education and place the child in private schooling . . . *only if* the parents or guardians establish that (1) an IEP calling for placement in a public school was inappropriate under the IDEA, and (2) the private school placement by the parents was proper under the Act." *Michael F.*, 118 F.3d at 248 (citing *School Committee of Burlington*, 471 U.S. at 369-70) (emphasis in original).

### c.  The Child Find Obligation

The "child find"[3] provisions of the IDEA require, in exchange for federal funding, that each LEA must locate, identify, and evaluate all children residing in the state with disabilities and who are in need of special education and related services. *See* 20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 300.131(a); *Knable ex rel. Knable v. Bexley City School District*, 238 F.3d 755, 762-63 (6th Cir.), *cert. denied*, 533 U.S. 950 (2001).  States must provide all such disabled children a FAPE, 20 U.S.C. § 1401(9), and school districts receiving funds under the IDEA must establish an IEP for each child with a disability, *see* 20 U.S.C. § 1414(a)(5).

---

[3]        See *Forest Grove School District*, 557 U.S. at 245.

The court must undertake a two-part inquiry to determine whether a LEA has complied with its child find responsibilities.  First, the court must examine whether the LEA had reason to suspect that a student had a disability, and whether that agency had reason to suspect that special education services might be needed to address that disability.  *W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Public Schools,* 486 F.3d 791 (3d Cir. 2007).  Next, the court must determine if the local educational agency evaluated the student within a reasonable time after having notice of the behavior likely to indicate a disability.  *El Paso Independent School District v. Richard R.*, 567 F. Supp. 2d 918, 950 (W.D. Tex. 2008).  A school district's failure to comply with the child find provision constitutes a procedural violation of the IDEA.  *School Board of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928, 942-44 (E.D. Va. 2010) (citing *Forest Grove School District*, 557 U.S. at 245).

### d.  Remedy of Reimbursement

Under the IDEA, the court has the power to "grant such relief as [it] determines is appropriate," *see* 20 U.S.C. § 1415(i)(2)(C)(ii)-(iii), including retroactive reimbursement for private school tuition.  *See* 20 U.S.C. § 1412(a)(10)(C)(ii); 34 C.F.R. § 300.148(c); *School Committee of Burlington*, 471 U.S. at 370; *Regional School Unit 51 v. Doe*, 920 F. Supp. 2d 168, 209 (D. Me. 2013).  Yet the court may, in its discretion, deny or reduce reimbursement based upon equitable

considerations.  *See* 20 U.S.C. § 1412(a)(10)(C)(iii); *Forest Grove School District*, 557

U.S. at 246-47; *R.C. ex rel. S.K., D.H. v. Keller Independent School District*, 958 F. Supp.

2d 718, 737-38 (N.D. Tex. 2013) (McBryde, J.).

### B.  Application of the Law

Woody contends that DISD had a duty, under the IDEA, to offer Kelsey a

FAPE and that DISD failed to do so.  Woody's Brief in Support of Her Motion for

Summary Judgment (docket entry 21) at 7-10.  Woody argues that DISD had an

obligation to adopt, develop, offer, and implement an IEP for Kelsey under three

alternative theories.  Trial Transcript 57:7-58:11, 147:5-12.  First, Woody urges that

DISD was obligated to follow the procedures prescribed in 34 C.F.R. § 300.323(f)

and 19 TEX. ADMIN. CODE § 89.1050(j)(2) because Kelsey qualified as a child who

transfers from another state with a current IEP.  Trial Transcript 58:12-68:7.  Second,

Woody maintains that Kelsey is not a parentally placed student in private school, as

defined in 34 C.F.R. § 300.130 and 19 TEX. ADMIN. CODE § 89.1096(b), because

Woody did not unilaterally place Kelsey in private school after a local school district

developed an IEP placing Kelsey in public school.  Trial Transcript 68:8-70:13.

Woody contends that even if Kelsey was a parentally placed student in private school,

DISD violated the IDEA, and Woody is owed retroactive reimbursement.  Trial

Transcript 68:8-70:13, 150:14-151:19.  Third, Woody insists that even if Kelsey does

not qualify as a transfer student from another state, DISD was obligated under the

child find provisions, 34 C.F.R. § 300.131(a) and 20 U.S.C. § 1412(a)(3)(A), to offer Kelsey a FAPE, which Woody contends it failed to do.  Trial Transcript 70:14-73:22, 160:12-18, 166:8-11.  Woody contends, under several theories, that DISD violated the IDEA's procedural requirements, thus impeding Kelsey's right to a FAPE.  Trial Transcript 73:19-24; *see also* 34 C.F.R. § 300.513(a)(2)(i)-(iii).  Therefore, Woody requests retroactive reimbursement for Kelsey's Winston School tuition for her senior year of high school.

DISD, however, contends that (1) Kelsey does not qualify as a transfer student under 34 C.F.R. § 300.323(f), Trial Transcript 111:6-126:24; (2) Kelsey is a parentally placed student in private school who is not entitled to relief because Kelsey's May 2014 IEP placing Kelsey in public school was appropriate, Trial Transcript 126:23-137:16; (3) DISD did not violate its child find obligations, Trial Transcript 104:14-109:9; and (4) DISD did not violate IDEA's procedures and satisfied all of its obligations under IDEA, Trial Transcript 104:14-110:17.  Further, DISD asserts that Woody acted unreasonably throughout the administrative process, frustrating DISD's efforts.  Trial Transcript 137:17-140:10.  Lastly, DISD asserts that Woody's claim for reimbursement is frivolous.  Trial Transcript 141:14-142:6.

### 1.  *Is Kelsey a Transfer Student under 34 C.F.R. § 300.323(f)?*

DISD contends that Kelsey is not a transfer student under the statute and corresponding federal and state regulations because she never enrolled with DISD,

and therefore DISD did not have to provide her with comparable services.  Trial Transcript 111:6-126:24.  Woody contests that DISD's argument puts "form over substance."  Trial Transcript 61:5-9.  Yet, Woody admits that "[t]here's no question that the statute does not contemplate a situation like happened here."  Trial Transcript 61:10-21.

The plain language of the transfer student provision does not apply to Kelsey. *Maynard v. District of Columbia*, 701 F. Supp. 2d 116, 123 (D.D.C. 2010) (holding that § 300.323(f) does not apply where the student's IEP was developed by a private school, and student "transferred" during the summer[4]).  The settlement agreement between Woody and LAUSD and the May 2013 IEP placed Kelsey at Westview for the 2013-2014 school year.  JX 3 at 000318-20; WX 8 at 000620.  By agreement, Woody and LAUSD substituted the Winston School for Westview.  Due Process T. 80:6-16, 224:3-10; Trial Transcript 25:17-26:3.  When Woody moved from LAUSD in August 2013, LAUSD's duties to Kelsey transferred to DISD.  34 C.F.R. § 300.101.  A student's IEP "follow[s] [the] special education student[] when [she] move[s] to another state."  *A.F. v. Hamamoto*, No. CV 07-CV-00278 JMS (KSC),

---

[4]     The parties agree that "during the school year" means "IEP year," not a school's academic year.  Trial Transcript 111:2-5.  Some case law supports the opposite definition of "during the school year."  See *Maynard*, 701 F. Supp. 2d at 123.  The Fifth Circuit has not defined whether "during the school year" refers to the school's year or the student's IEP year.  Since the court concludes that the transfer provision does not apply here, the court will accept the parties' agreement, Trial Transcript 111:2-5, that "during the school year" means the student's "IEP year" for the purposes of this memorandum of decision.

2007 WL 2684133, at *6 (D. Hawaii Sept. 7, 2007).  Yet Kelsey did not enroll in a

new school.  JXs 19-20 at 000552-53.  The plain language of the federal regulation

conditions the provision of FAPE, comparable to the services described in the IEP

developed by the previous public agency, on the enrollment of the student in a new

school.  *N.B. v. Hawaii*, No. 13-CV-00439 LEK, 2014 WL 3663452, at *4 (D.

Hawaii July 21, 2014) (holding that state school district did not owe transfer student

a FAPE at the time his father called to inform the school district of the student and

the recent move to the state); *Connecticut National Bank v. Germain*, 503 U.S. 249,

253-54 (1992) (courts must "presume that [the] legislature says in a statute what it

means and means in a statute what it says.").

     34 C.F.R. § 300.323(f) informs the court's analysis.  See *Ruby J. v. Jefferson

County Board of Education,* No. 2:14-CV-00581-RDP, __ F. Supp. 3d. __, 2015 WL

4911596, at *1-2 (N.D. Ala. Aug. 17, 2015) (example of a case falling squarely

within 34 C.F.R. § 300.323(f)).  IDEA and the implementing federal regulations did

not predict the unique factual situation before the court.  Here, an IEP, developed by

a California local school district in conjunction with a settlement agreement, placed a

student at a private school within the geographic borders of a Texas local school

district, to which the student's mother later moved, thereby transferring all IDEA

obligations from the California local school district to the Texas local school district,

within which the child was already enrolled in the private school.  The court is not

surprised that Congress did not anticipate such a set of facts, despite its enactment of a complex and comprehensive regulatory scheme.

Under 34 C.F.R. § 300.323(f), DISD was not obligated to implement Kelsey's May 2013 IEP developed by LAUSD. *J.B. ex rel. B.B. v. Lake Washington School District*, No. 12-CV-0574-RSL, 2013 WL 195375, at *2-3 (W.D. Wash. Jan. 17, 2013); *compare* 34 C.F.R. § 300.323(f) *with* 34 C.F.R. § 300.323(e). Further, the provision illustrates IDEA's policy that no student with educational disabilities should fall through the cracks of administrative procedure.[5]  20 U.S.C. § 1400(d)(1)(A) ("[T]o ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]").  The provision does not mandate that a Texas LEA adopt an IEP developed by a California LEA, yet it must provide services while the Texas LEA determines its evaluation of the student.  See *Sterling A. ex rel. Andrews v. Washoe*

---

[5]      See also *Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities*, Office of Special Education and Rehabilitative Services, 71 FED. REG. 46,540, 46,682 (Aug. 14, 2006) ("Under § 300.323(f)(1), if the new public agency determines that an evaluation of the child is necessary to determine whether the child is a child with a disability under the new public agency's criteria, the new public agency must conduct the evaluation.  Until the evaluation is conducted, § 300.323(f) requires the new public agency, in consultation with the parent, to provide the child with FAPE, including services comparable to those described in the IEP from the previous public agency.  The specific manner in which this is accomplished is best left to State and local officials and the parents to determine.  We do not believe that any further clarification is necessary.").

- 43 -

*County School District*, No. 3:07-CV-00245-LRH-RJJ, 2008 WL 4865570, at *5-6 (D. Nev. Nov. 10, 2008) (citing 71 FED. REG. 46540 (Aug. 14, 2006)).  One purpose of the provision is to ensure that all students eligible for special education services have a FAPE available to them at all relevant times.  20 U.S.C. § 1400(d)(1)(A); 71 FED. REG. 46540, at 46682.

Yet since Kelsey did not enroll in a new school, Kelsey is not a transfer student from another state as defined by IDEA and the federal and state regulations.

### 2.  *Is Kelsey a Parentally Placed Student in Private School?*

When a child with a disability is enrolled by his or her parents "directly in a private school or facility" and is referred to a local school district, the local district "shall convene an [ARDC] meeting to determine whether the district can offer the student a [FAPE]."  19 TEX. ADMIN. CODE § 89.1096(b); 34 C.F.R. § 300.130.  If the local district determines that it can offer a FAPE to the student, "the district is not responsible for providing educational services to the student, except as provided in 34 C.F.R. § 300.130-300.144."  19 TEX. ADMIN. CODE § 89.1096(b).  When a parent "unilaterally withdraws their child from public school and enrolls them in a private school, the parent is entitled to reimbursement if a hearing officer or court later determines that the private school education was "otherwise proper under IDEA," even if it did not meet each specific IDEA requirement.  *Michael Z*, 580 F.3d at 295 (citing *Carter*, 510 U.S. at 9).

If Kelsey was a parentally placed student in private school, the court's analysis must focus on whether the Winston School "was an appropriate placement, and that the cost of the private education was reasonable." *District of Columbia v. Abramson*, 493 F. Supp. 2d 80, 86-87 (D.D.C. 2007) (citing *Carter*, 510 U.S. at 15). When parents unilaterally place their children in private school after the local district offers a FAPE at the local public school, the assumption is that the local district properly placed the student under its IDEA obligations. *Carter*, 510 U.S. at 12 ("Congress intended that IDEA's promise of a '[FAPE]' for disabled children would normally be met by an IEP's provision for education in the regular public schools or in private schools chosen jointly by school officials and parents."). If the parent elects to move the student to private school, the parent assumes the financial risk of private school unless the parent can prove that the local district's IEP was inadequate, the private school was the appropriate placement for the child, and the cost of the private school was reasonable. *Carter*, 510 U.S. at 12-13, 15-16; *School Committee of Burlington*, 471 U.S. at 370.

Woody did not unilaterally place Kelsey at the Winston School for the 2013-2014 school year. Due Process T. 80:6-16, 224:3-10; Trial Transcript 25:17-26:3; JX 3 at 000318-20; WX 8 at 000620-21. While Woody clearly wanted Kelsey at the Winston School, JX 5 at 000328; DX 58 at 001012; Due Process T. 241:13-19, Kelsey was placed at the Winston School by an agreement between LAUSD and

Woody.  WX 8 at 000618; JX 3 at 000318-20; Trial Transcript 25:17-26:3.  The

settlement agreement and the May 2013 IEP (developed soon after the settlement

agreement) together place Kelsey at a California certified non-public school,

Westview.  WX 8 at 000618; JX 3 at 000318-20; Trial Transcript 25:17-26:3.  The

settlement agreement establishes that LAUSD and Woody agreed to replace

Westview with the Winston School for the 2012-2013 school year.  WX 8 at

000618.

This is not a situation in which Woody disagreed with the placement of Kelsey

in a public school by a local district and unilaterally placed her in a private school.

*Adam J. ex rel. Robert J.*, 328 F.3d at 812.  Therefore, Kelsey is not a parentally placed

student in private school.  See *Sam K. ex rel. Diane C. v. Hawaii Department of

Education*, 788 F.3d 1033, 1040 (9th Cir. 2015).

### 3.  *Did DISD Violate its Obligation to Kelsey Under 20 U.S.C. §§ 1412(a)(3)(A)?*

Texas has an ongoing obligation to "identif[y], locat[e], and evaluat[e]" "all

children with disabilities residing in the State" to ensure that they receive needed

special education services.  20 U.S.C. §§ 1412(a)(3)(A), 1412(a)(10)(A)(ii).  The

child find obligation "comport[s] with Congress' acknowledgement of the paramount

importance of properly identifying each child eligible for services" and seeks to

prevent a situation where a "school district unreasonably failed to identify a child

with disabilities."  *Forest Grove School District*, 557 U.S. at 245.

The court must undertake a two-part inquiry to determine whether a local educational agency has complied with its child find responsibilities.  34 C.F.R. § 300.131(a); 20 U.S.C. § 1412(a)(3)(A).  First, the court must examine whether the LEA had reason to suspect that a student had a disability, and whether that agency had reason to suspect that special education services might be needed to address that disability.[6]  *Matula*, 67 F.3d at 501.

On September 19, 2013, DISD received a letter from Woody's attorney, Roy Atwood, informing the district of Kelsey's residence within DISD.  JX 5; Trial Transcript 69:7-12; *James ex rel. James v. Upper Arlington City School District*, 228 F.3d 764, 768 (6th Cir. 2000), *cert. denied*, 532 U.S. 995 (2001) (holding that residency, rather than enrollment, triggers a district's IDEA obligations.).  Atwood's letter informed DISD that a current IEP, developed by LAUSD, placed Kelsey at the Winston School.  JX 5 at 000327.  Additionally, the letter summarized Kelsey's educational disabilities and conditions.  *Id.* at 000327-28.  Lastly, the letter attached Kelsey's current May 2013 IEP, and two medical evaluations of Kelsey.  *Id.* at 00329-359.

---

[6]     The only Fifth Circuit case to address the child find provision is not on point.  In *D.G. v. Flour Bluff Independent School District*, 481 Fed. App'x 887, 893 (5th Cir. 2012), the Fifth Circuit held that the "IDEA does not penalize school districts for not timely evaluating students who do not *need* special education." (emphasis in original).  Since DISD does not contest that Kelsey is eligible under the IDEA, Trial Transcript 182:10-16, this holding does not affect the court's analysis.

While DISD had no obligation to adopt LAUSD's May 2013 IEP, upon receiving this letter, DISD had reason to suspect that [Kelsey] had a disability, and had reason to suspect that special education services might be needed to address that disability. *Matula*, 67 F.3d at 501 (holding that conversations put the school district on notice of potential need for special education services); *see also* 34 C.F.R. § 300.111(c)(1); *Richard R.*, 567 F. Supp. 2d at 951 (holding that local school district had reason to suspect a student had a disability due to student's consecutive failure on assessment exams and difficulties in multiple subjects); *Department of Education, State of Hawaii v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1195 (D. Haw. 2001) ("[T]he threshold for 'suspicion' is relatively low, and . . . the inquiry [was] not whether or not she actually *qualified* for services, but rather, was whether she should be *referred* for an evaluation.") (emphasis in original).  A letter attaching an IEP developed by a public agency, regardless of the quality of the IEP, *see* JX 3; Trial Transcript 26:4-16, and two medical reports supporting the IEP's conclusions and recommendations, JX 5 at 000330-59, was even stronger notice that Kelsey might have a disability requiring special education services than a student's failure on a few exams, as in *Richard R.*, 567 F. Supp. 2d at 951.

Next, the court must determine if the LEA evaluated the student within a reasonable time after having notice of the behavior likely to indicate a disability. *Richard R.*, 567 F. Supp. 2d at 950 (holding that thirteen months between request for

evaluation and offer of evaluation constituted a child find violation).  The Fifth

Circuit has yet to rule on this point, and other federal courts faced with this issue

have developed varying standards.  *Matula*, 67 F.3d at 501 (holding that a delay of

six months from observation of behavior until referral for evaluation constituted a

triable issue as to child find violation); *Cari Rae*, 158 F. Supp. 2d at 1195-97 (finding

that a delay of at least six months from point at which school had reason to suspect

child had disability to scheduling of evaluation constituted a child find violation);

*New Paltz Central School District v. St. Pierre ex rel. M.S.*, 307 F. Supp. 2d 394, 401

(N.D. N.Y. 2004) (holding that a delay of approximately ten months from the time

mother informed school district that son was experiencing difficulties until

performance of comprehensive evaluation constituted a child find violation).

On September 19, 2013, DISD received Atwood's letter informing the district

of Kelsey's residence within DISD.  JX 5; Trial Transcript 69:7-12.  At the

December 17, 2013 meeting, DISD requested permission from Woody to evaluate

her daughter.  JX 8 at 000375; Trial Transcript 34:20-24.  DISD evaluated Kelsey in

February 2014, and submitted its FIE on April 8, 2014.  JX 11 at 000396-431.

DISD sent a corrected FIE on April 16, 2014.  PX 33 at 000665-701.  DISD

completed its evaluation of Kelsey seven months after DISD had reason to suspect

Kelsey had a disability.  JX5 at 000327-59; JX11 at 000396-431.  DISD requested to

evaluate Kelsey within three months of receiving notice.  JX 5 at 000327-59; JX 8 at

000375.  Further, within those three months, DISD had to forward Atwood's letter to its counsel, request files from LAUSD, schedule a meeting with Woody, administrators and teachers -- who ended up not coming -- and figure out exactly what DISD's obligations were to Kelsey, a student whose situation did not fit within the comprehensive IDEA framework.  JXs 5-7 at 000327-62; DX 61 at 001019; DX 68 at 001038, DX 69 at 001041-44.

DISD's delay of three months between the time it received notice of Kelsey's residence and its offer to evaluate Kelsey was reasonable.  *Cari Rae*, 158 F.Supp.2d at 1195-97.  Additionally, Woody and her counsel are partially responsible for the delay between the request to evaluate and the completion of the evaluation because they did not return the consent to evaluate until a month after DISD's offer to evaluate, JX9 at 000384-85, and Atwood channeled all communication between DISD and the Winston School through him.  WX61 at 001019.  Further, DISD completed its evaluation faster than other school districts in cases in which courts have that the delay was unreasonable.  See *Richard R.*, 567 F. Supp. 2d at 950; *St. Pierre ex rel. M.S.*, 307 F.Supp.2d at 401.  Additionally, in *Matula*, 67 F.3d at 501, a six month delay before "referring" the child for an evaluation was an unreasonable delay, whereas here the child was referred for an evaluation within three months, and the evaluation was completed roughly seven months after DISD was on notice.  Therefore, DISD did not

violate its child find obligations because it evaluated Kelsey within a reasonable time.

*Cari Rae*, 158 F. Supp. 2d at 1195-97.

### 4. *Did DISD Violate the Procedural Requirements of IDEA to the Extent That it Impeded Kelsey's Right to a FAPE?*

While DISD did not violate the transfer student provision and did not violate the child find provision, the court's inquiry does not end there.  To determine if a school district has met its obligation under IDEA, the court must determine (1) whether the district complied with the procedural requirements of IDEA, and (2) whether the district offered a program to the student that was reasonably calculated to provide educational benefits.  *Rowley*, 458 U.S. at 206-07.

### a.  DISD Failed to Offer Kelsey a FAPE for the 2013-2014 School Year

IDEA provides that a FAPE must be available to all IDEA eligible students throughout their education from the age of three until twenty-one, or graduation from high school, whichever occurs first.  34 C.F.R. § 300.101; 34 C.F.R. § 300.102(a)(3)(i).  The IDEA requires a LEA to review a student's IEP at least annually and to make any necessary revisions to ensure that the child is receiving an appropriate education.  *See* 20 U.S.C. § 1414(d)(4)(A)(i); *see also* 34 C.F.R. § 300.324(b)(1)(i).  Further, the express purpose of the statute is to ensure that all children with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and to ensure that

- 51 -

the rights of these children and their parents are protected.  20 U.S.C.

§ 1400(d)(1)(A-B).

DISD admits that Kelsey is an IDEA eligible student, and claims it never

disputed that she was IDEA eligible.  Trial Transcript 97:14-18.  However, DISD

contended throughout the IDEA administrative process that Kelsey did not qualify

for special education services until the May 22, 2014 ARDC meeting, wherein DISD

agreed with Woody that Kelsey needed special education services.  JX 8 at 000365;

JX 11 at 000431; JX 13 at 000470.  Regardless, the parties do not dispute that

Kelsey qualifies as an IDEA eligible student with a qualifying disability.  Trial

Transcript 97:14-18.

As a result, Kelsey's residency triggered certain IDEA obligations for DISD.  34

C.F.R. §§ 300.101, 300.323(a).  At a bare minimum, DISD was obligated under the

child find provision to find and evaluate Kelsey within a reasonable time.  34 C.F.R.

§ 300.131.  The court concluded that DISD met this obligation.  *See* Section III.B.3.

Yet, above this bare minimum obligation, when Kelsey was referred to DISD, DISD

was at least obligated under the parental placement provisions, when it received

Atwood's letter, to convene an ARDC meeting to determine whether the district

could offer Kelsey a FAPE.  *See* 20 U.S.C. § 1412(a)(10)(C)(ii); 34 C.F.R. § 300.130;

19 TEX. ADMIN. CODE § 89.1096 (b).  IDEA's comprehensive scheme limits the rights

of students and parents, who unilaterally enroll the student in private school in

defiance of the local school district's placement of the child in public school.  34

C.F.R. § 300.130; 19 TEX. ADMIN. CODE § 89.1096 (b).  Kelsey did not qualify as a

parentally placed student in a private school because her situation is not as suspect,

under IDEA, as when a parent unilaterally disregards an IEP and puts the student in

private school.  *School Committee of Burlington*, 471 U.S. at 373-74 ("parents who

unilaterally change their child's placement . . . do so at their own financial risk").

Therefore, a student, like Kelsey, who was enrolled in the Winston School for her

senior year as a result of a settlement agreement and IEP, developed by a local school

district, should at a minimum receive the rights provided to students who were

unilaterally placed in private school by her parent.  34 C.F.R. § 300.132, 34 C.F.R.

§ 300.148(a).  Under IDEA, Kelsey should be given greater rights than a parentally

placed student in private school.  *Sam K.*, 788 F.3d at 1039-40 (holding that a

student's private school tuition should be reimbursed where parent did not

unilaterally place student in private school because the school district tacitly

consented to the private school attendance before proposing a different placement).

Therefore, at a minimum, DISD was obligated to convene an ARDC meeting and

make an offer of FAPE to Kelsey in a timely manner.  *See* 34 C.F.R. § 300.148.

 DISD never finalized an offer of FAPE to Kelsey.  Trial Transcript 165:4-

166:20.  DISD did not explicitly offer FAPE to Kelsey until May 22, 2014, seven

days before Kelsey was scheduled to graduate from the Winston School and after she

had completed all of her academic requirements.  JX 13 at 000471; Due Process T. 190:4-192:8; Trial Transcript 34:20-24, 56:24-57:3, 67:25-68:1, 83:18-24, 153:5-8. Further, DISD's non-finalized offer of FAPE, in the form of the May 2014 IEP, applied to the time period beginning April 24, 2014 and ending April 24, 2015.  JX 13 at 000448; Trial Transcript 46:2-7, 130:13-131:8.  At the December 17, 2013 meeting, DISD rejected LAUSD's May 2013 IEP.  JX 8 at 000375.  Therefore, when DISD rejected LAUSD's May 2013 IEP, Kelsey was an IDEA eligible student without an IEP in place.  At or before the December 17, 2013 meeting, DISD did not offer temporary services of any kind, let alone comparable services.  JX 8 at 000375; Due Process T. 385:7-388:4; Trial Transcript 119:6-120:20.

DISD never tendered Kelsey an IEP offering FAPE for the time period from May 2013, or September 19, 2013, to April 24, 2014.  JX 13 at 000448; Trial Transcript 56:24-57:3, 67:2-20.  DISD had the right to reject LAUSD's May 2013. *See* 34 C.F.R. § 300.323(f).  Yet when it rejected LAUSD's IEP, it was obligated to make an offer of FAPE to Kelsey on a temporary basis while it evaluated her, because IDEA clearly requires that an IEP be in place for a disabled student "residing in the State between the ages of 3 and 21."  20 U.S.C. § 1412(a)(1)(A); *see also* 34 C.F.R. § 300.101(a)-(c); 34 C.F.R. § 300.323(f); *Sam K.*, 788 F.3d at 1039-40.

The IEP proposed on May 22, 2014 offered Kelsey a FAPE at a DISD public high school.  JX 13 at 000471.  The offer of FAPE was not timely.  See *Mr. & Mrs. A.*

*ex rel. D.A. v. New York City Department of Education*, 769 F. Supp. 2d 403, 417 (S.D.

N.Y. 2011) (holding that school district failed to offer FAPE in a timely manner

where school district did not offer FAPE at a meeting, thereby allowing the school

year to commence without a FAPE in place).  DISD did not offer temporary FAPE in

September even though it knew Kelsey had a current IEP placing her in a non public

school.  *Sam K.*, 788 F.3d at 1039-40.  DISD knew that Kelsey had no FAPE or IEP

in place when it rejected LAUSD's May 2013 IEP.  *Mr. & Mrs. A. ex rel. D.A.*, 769 F.

Supp. 2d at 417.  At least as soon as DISD informed Woody of its rejection of the

LAUSD IEP, it should have offered temporary services to the extent necessary.  *Sam

K.*, 788 F.3d at 1039-40.  There is no evidence in the record that DISD made an

informal offer of temporary special education services to Woody.  Trial Transcript

31:10-13; JX 8 at 000368, 000375.

DISD insists that an offer of FAPE was futile because from the beginning of

this process Woody was intent on keeping Kelsey at the Winston School.  *See* JX 5 at

000328; DX 58 at 001012; Due Process T. 241:13-19; Trial Transcript 103:7-9,

117:7-11, 127:10-13.  There is strong evidence that Woody would not have accepted

DISD's offer of FAPE.  Due Process T. 241:13-19; Trial Transcript 103:7-9.

However, whether Woody would have accepted DISD's offer of FAPE is not the

relevant inquiry.  DISD was obligated to make an offer.  *Lague v. District of Columbia*,

No. 14-CV-1302 TSC/DAR, 2015 WL 5467629, at *7 (D.D.C. Sept. 16, 2015)

("[N]o authority supports the proposition that a student's parents or guardians, by any action or inaction, can relieve a school district of its obligation to offer FAPE to a child with a disability residing in the district; indeed, such a result would be "manifestly incompatible with IDEA's purpose of 'ensur[ing] that all children with disabilities have available to them a free appropriate public education.") (internal quotations omitted).  If Woody "made clear" at the time that Woody would not have accepted the offer of FAPE, DISD would not be obligated.  *District of Columbia v. Vinyard*, 971 F. Supp. 2d 103, 109 (D.D.C. 2013) *appeal dismissed*, No. 13-7167, 2013 WL 6818236 (D.C. Cir. Dec. 26, 2013); *Moorestown Township Board of Education v. S.D.*, 811 F. Supp. 2d 1057, 1071-72 n.10 (D.N.J. 2011).  DISD cites Woody's testimony at the due process hearing as proof that Woody made clear at the time that Woody would not have accepted the offer of FAPE.  Trial Transcript 103:7-9.  Yet DISD stretches Woody's testimony beyond its literal meaning.  While Woody testified that she had the subjective intent of not moving Kelsey from the Winston School because the move was not recommended by Kelsey's doctors, there is no evidence that Woody "made clear" she would not accept an offer of FAPE from DISD at the relevant time, fall 2013 through April 2014.

Next, DISD points to Atwood's letter, requesting reimbursement from DISD for Kelsey's placement at the Winston School, as evidence that Woody made clear she would not have accepted an offer of FAPE.  Trial Transcript 138:11-19.  The

letter assumes that DISD will accept and adopt LAUSD's May 2013 IEP and enforce the obligations thereunder.  JX 5 at 000327-28.  The letter does not make clear that Woody would never enroll Kelsey in a DISD public school.  *Id.*  The letter simply asks for what Woody wanted, *i.e.*, the best outcome from her point of view.  Woody was not obligated to request an offer of FAPE.  20 U.S.C. § 1412(a)(1)(A).  Rather, DISD had the obligation to come forward and make an offer of FAPE in response to the request for DISD to adopt and implement the LAUSD May 2013 IEP.  *Id.* DISD's failure to offer Kelsey a FAPE of any kind violated the procedural requirements of IDEA.

### b.  DISD Violated IDEA Requirements When It Failed to Finalize the May 2014 IEP

Woody maintains that DISD violated the procedural requirements of IDEA when DISD did not consider Dr. McCallon's IEE and failed to reconvene the ARDC meeting.  Trial Transcript 49:20-50:13.  DISD responds that when Kelsey graduated from the Winston School on May 29, 2014, DISD no longer had any obligations to provide a FAPE for Kelsey.  Trial Transcript 140:19-21.  Therefore, DISD argues, it did not have to reconvene the ARDC meeting to respond to the Dr. McCallon's IEE. Trial Transcript 110:12-114:6, 140:19-21.

When an ARDC proposes an IEP to which the parent objects, the parent may request an IEE.  34 C.F.R. § 300.502(c) ("the results of the evaluation . . . must be considered by the public agency, if it meets agency criteria, in any decision made with

respect to the provision of FAPE to the child"); *B.H. v. West Clermont Board of Education*, 788 F. Supp. 2d 682, 693 (S.D. Ohio 2011). Woody requested an IEE, for which DISD agreed to pay. JX 13 at 000471. A student has a right for the ARDC to consider the results from an IEE that meets agency criteria.[7] *Seth B. ex rel. Donald B. v. Orleans Parish School Board*, No. 15-30164, ___ F.3d ___, 2016 WL 157998, at *12 (5th Cir. Jan. 13, 2016) (Smith, Cir. J., dissenting). Therefore, an IEP is not finalized if the ARDC did not consider an IEE. 34 C.F.R. § 300.502(c); *M.S. ex rel. J.S. v. Utah School for the Deaf & Blind*, No. 2:13-CV-420 TS, 2014 WL 4216027, at *2, *22 (D. Utah Aug. 25, 2014), *appeal dismissed* (Jan. 27, 2015). DISD was obligated to reconvene the ARDC to consider Dr. McCallon's IEE. 34 C.F.R. § 300.502.

DISD contends that this obligation was extinguished by Kelsey's graduation. Trial Transcript 140:19-21. DISD is correct that a child is no longer eligible under IDEA when he or she graduates from high school. 34 C.F.R. § 300.102(a)(3)(i); *T.S. v. Independent School District No. 54*, 265 F.3d 1090, 1092 (10th Cir. 2001), *cert. denied*, 535 U.S. 927 (2002); *Board of Education v. Nathan R.*, 199 F.3d 377, 381 (7th Cir.), *cert. denied*, 531 U.S. 822 (2000). However, DISD is not correct that Kelsey's graduation extinguished DISD's obligations to Kelsey arising from before her graduation. *D.A. v. Houston Independent School District*, 716 F. Supp. 2d 603, 612-13 (S.D. Tex. 2009) *aff'd sub nom. D.A. ex rel. Latasha A. v. Houston Independent School*

---

[7]      DISD does not contend that Dr. McCallon's IEE, JX 23 at 000557-71, does not meet agency criteria under 34 C.F.R. § 300.304(b)-(c).

*District*, 629 F.3d 450 (5th Cir. 2010).  The dispute revolves around Kelsey's placement for her senior year and whether DISD is liable for Kelsey's tuition at the Winston School.  The dispute is not mooted by Kelsey's graduation because the dispute relates to the school year prior to Kelsey's graduation.  *D.A.*, 716 F. Supp. 2d at 612-13 ("[T]he presence of an actionable claim for compensatory education will insulate an IDEA case against a mootness challenge even after the child's eligibility for special education services ends.") (internal quotations omitted); see also *Pace v. Bogalusa City School Board*, 325 F.3d 609, 618 (5th Cir.) *reh'g en banc granted, opinion vacated on other grounds*, 339 F.3d 348 (5th Cir. 2003) and *on reh'g en banc*, 403 F.3d 272 (5th Cir.), *cert. denied*, 546 U.S. 933 (2005).  DISD was obligated to reconvene the ARDC to consider the IEE even though Kelsey graduated because Kelsey was seeking compensatory relief.  34 C.F.R. § 300.502; *D.A.*, 716 F. Supp. 2d at 612-13.

### c.  Whether the Procedural Violations Impeded Kelsey's Right to a FAPE

While DISD violated the procedural requirements of the IDEA, not all procedural violations lead to the conclusion that Kelsey did not receive a FAPE.[8]

---

[8]     The second prong of the *Rowley* analysis, 458 U.S. at 206-07, is "whether the district offered a program to the student that was reasonably calculated to provide educational benefits."  FDHO at 000023.  The court does not reach this issue.  DISD's procedural violations denied Kelsey a FAPE for her senior year.  See *Forest Grove School District*, 557 U.S. at 238-39.  An analysis of whether the proposed, forward-looking, IEP was reasonably calculated to provide educational benefits is not necessary, since DISD's procedural violation *per se* impeded Kelsey's right to FAPE during her senior year.  *Blackman v. District of Columbia*, 277 F. Supp. 2d 71, 79

(continued...)

*Regional School Unit 51*, 920 F. Supp. 2d at 204.  A student does not receive a FAPE only if the procedural inadequacies (i) impede the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of educational benefit.  34 C.F.R. § 300.513(a).  Prong (ii) is not applicable because Woody adequately participated in the decision making process regarding the provision of a FAPE.  Trial Transcript 110:5-8, 126:5-8, 134:11-13.  Prong (iii) is not applicable because Kelsey received the educational benefits desired at the Winston School, and graduated from the Winston School.  Trial Transcript 46:2-9; JXs 19-20 at 000552-53.

The issue is whether DISD's procedural violations impeded Kelsey's right to a FAPE.  *Sytsema ex rel. Sytsema v. Academic School District No. 20*, 538 F.3d 1306, 1313 (10th Cir. 2008) ("[O]ur precedent hold[s] that procedural failures under IDEA amount to substantive failures only where the procedural inadequacy results in an effective denial of a FAPE.").  DISD's failure to offer an IEP for Kelsey for her senior year impeded her right to a FAPE because she had a right to a FAPE and DISD never recognized that it effectively denied her a FAPE.  See *Forest Grove School District*, 557 U.S. at 238-39 ("[W]hen a child requires special-education services, a school district's failure to propose an IEP of any kind is at least as serious a violation of its

---

[8](...continued)
(D.D.C. 2003).

- 60 -

responsibilities under IDEA as a failure to provide an adequate IEP."); *Blackman*, 277

F. Supp. 2d at 79 ("[T]he failure to provide an IEP . . . constitutes the denial of a

[FAPE] as required by the IDEA," resulting in "*per se* harm to the student[.]")

(internal citation omitted); *Justin G. ex rel. Gene R. v. Board of Education of Montgomery

County*, 148 F. Supp. 2d 576, 584 (D. Md. 2001) ("It is undisputed that no IEP was

developed for the 1998-1999 school year. Such a violation goes to the heart of the

district's ability to provide a FAPE and resulted in a denial thereof."); *Regional School

Unit 51*, 920 F. Supp. 2d at 204-06 (holding that the school "district violated the

IDEA, denying [him] a FAPE, when it did not recognize him as an IDEA-eligible

student until partway through his eighth grade year" by failing to develop and

implement an IEP to an IDEA-eligible student); *Gabel v. Board of Education of the Hyde

Park Central School District*, 368 F. Supp. 2d 313, 329 (S.D.N.Y. 2005).

    DISD knew that Kelsey was enrolled at the Winston School for the 2013-2014

school year.  JX 5 at 000327-28; DX 68 at 001038.  DISD waited until May 22,

2014 to make any offer of FAPE to Kelsey, and its offer of FAPE to Kelsey was not

for the 2013-2014 school year but for the 2014-2015 school year.  *See generally* JX 13.

While DISD evaluated her, it failed to recognize that Kelsey needed an IEP in place,

or at least an offer of temporary services.  See *Sam K.*, 788 F.3d at 1040 (while the

parents did not prove the school district was responsible for having an IEP in place by

the beginning of the school year, "that does not change the fact that the [school

district] knew that [he] was going to be enrolled in [the private school] in the meantime and necessarily consented to that enrollment for that school year because it had not offered another alternative."); *Regional School Unit 51*, 920 F. Supp. 2d at 204; *Blackman*, 277 F. Supp. 2d at 79.

DISD's actions failed to "ensure" that Kelsey's rights under IDEA were "not compromised" when her mother moved from California to Texas.  *Regional School Unit 51*, 920 F. Supp. 2d at 201 (citing 71 FED. REG. at 46,682); *Forest Grove School District*, 557 U.S. at 245 ("A reading of the Act that left parents without an adequate remedy when a school district unreasonably failed to identify a child with disabilities would not comport with Congress' acknowledgment of the paramount importance of properly identifying each child eligible for services.").  DISD did not need to offer comparable services, under 34 C.F.R. § 300.323(f), but it did need to offer some form of temporary services.  *Regional School Unit 51*, 920 F. Supp. 2d at 201.  DISD *per se* impeded Kelsey's right to a FAPE for the 2013-2014 school year because it failed to offer her a FAPE.  See *Adam J. ex rel. Robert J.*, 328 F.3d at 811 ("[A] school's failure to meet the IDEA's procedural requirements *may* alone warrant a finding that, as a

matter of law, the school has failed to provide a [FAPE].") (emphasis in original)[9];

*Blackman,* 277 F. Supp. 2d at 79.

> ### d.  Do the Balance of Equities Favor DISD's Reimbursement of Kelsey's Private School Tuition at the Winston School?

Under the IDEA, the court has the power to "grant such relief as [it]

determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  "[B]y empowering the

court to grant 'appropriate' relief Congress meant to include retroactive

reimbursement to parents as an available remedy in a proper case."  *School Committee*

*of Burlington,* 471 U.S. at 370.  "Courts fashioning discretionary equitable relief under

IDEA must consider all relevant factors."  *Carter,* 510 U.S. at 16.

DISD contends that Woody's claims are frivolous, unreasonable or without

foundation because Woody did not give DISD a good faith opportunity to comply

with the IDEA requirements.  Trial Transcript 100:21-2, 141:18-142:6.  Woody was

the prevailing party at the due process hearing, FDHO at 000029-30, and is the

prevailing party before the court.   Since Woody's claims are not frivolous, and DISD

---

[9]      The Fifth Circuit in  *Adam J. ex rel. Robert J.,* 328 F.3d at 813, held that a
procedural violation of IDEA results in the finding of a failure to provide a FAPE only
when the parent demonstrates that "(1) a procedural violation of the IDEA produced
substantive harm," or (2) the IEP was "not reasonably calculated to provide an
educational benefit."  This decision pre-dates the 2004 amendments to IDEA and the
underlying federal regulations, which include "impeded the child's right to a [FAPE]"
as a condition to holding a procedural violation constituted a denial of FAPE.  *See* 20
U.S.C. § 1415(f)(3)(E); 34 C.F.R. § 300.513(a)(2)(i).

is not the prevailing party before the court, DISD is not entitled to attorney's fees. *See* 20 U.S.C. § 1415(i)(3)(B)(i)(II).

While Woody is the prevailing party before the court, her conduct contributed in part to the imbroglio before the court. First, Woody did not contact DISD regarding her request for DISD to adopt LAUSD's May 2013 IEP for Kelsey until September 16, 2013. JX 5; Trial Transcript 156:11-13. Woody had rented an apartment in Dallas in July 2013, and moved back to Dallas in August 2013. Trial Transcript 26:21-25, 157:2-6; DX 57 at 001010. Further, Woody had planned, as early as November 2012 (when Kelsey relocated to Dallas), to move back to Dallas to be with Kelsey for her senior year. Due Process T. 77:1-20. Additionally, by summer 2013, Woody had just settled a legal battle with LAUSD regarding LAUSD's placement of Kelsey and LAUSD's responsibilities under the IDEA. WX 8 at 000618. Therefore, Woody was aware of the complex procedures under IDEA. To avoid the dispute, Woody should have contacted DISD about the possible move earlier.

There are several examples of parents' contacting school districts prior to their moves. *N.B.*, 2014 WL 3663452, at *1 (parent called the school district prior to child transfer to the school district); *Coleman v. Pottstown School District*, 983 F. Supp. 2d 543, 555 (E.D. Pa. 2013) *aff'd in part*, 581 F. App'x 141 (3d Cir. 2014) (during the summer months, the parent contacted school district before school began in the

new school district).  While Kelsey was not a parentally placed student in private

school, if she had been, her parent would have been required to notify the school

district at least 10 business days before removing the child from the public school.  34

C.F.R. § 300.148(d)(1)(ii)).  Although this doesn't control the court's analysis here, it

illustrates how Congress foresaw parents working with school districts through a

cooperative process.  *Rowley*, 458 U.S. at 205-06.

DISD was not notified of Kelsey's presence within its district until four weeks

into Kelsey's senior year and did not have the documentation it requested from

Woody until November 5, 2013.  JX 5 at 000327-28; JX 6 at 000360; JX 7 at

000361; WX 45 at 000835-39.  At that point, DISD did not know what services

Kelsey required because her 2013 IEP lacked critical information.[10]  DISD began

---

[10]      The 2013 IEP provided only that Kelsey would receive 1570 minutes
per week during which she would not participate with her non-disabled peers and the
related services of transportation and counseling.  JX 3 at 000318, 320.  An IEP,
which has been described as the "centerpiece" of the IDEA system, *Murphy v.
Arlington Central School District Board of Education*, 297 F.3d 195, 197 (2d Cir. 2002),
is "a written statement that sets out the child's present educational performance,
establishes annual and short-term objectives for improvements in that performance,
and describes the specially designed instruction and services that will enable the child
to meet those objectives." *R.E. v. New York City Department of Education*, 694 F.3d
167, 175 (2d Cir. 2012), *cert. denied*, 133 S.Ct. 2802 (2013).

IDEA requires that the IEP for each child include:

(1)      a statement of the child's present levels of
academic achievement and functional
performance;

(continued...)

- 65 -

trying to schedule an ARDC meeting, but because of school testing and holidays, was

unable to find a mutually convenient date before December 17.  Then, hours before

the December 17 meeting, Woody unilaterally instructed Kelsey's teachers from

Winston not to attend, thereby frustrating DISD's efforts to develop an up-to-date

IEP for Kelsey.  Thus, the school year was virtually half over, and Kelsey still did not

have a current IEP.  Although DISD violated its IDEA obligations in failing to offer

Kelsey a FAPE, the court concludes, in weighing the equities, that Woody was

---

[10](...continued)

    (2)    a statement of measurable annual goals;

    (3)    a description of how the child's progress
               toward meeting the annual goals will be
               measured;

    (4)    a statement of the special education and
               related services to be provided to the child;

    (5)    an explanation of the extent to which the
               child will not participate with nondisabled
               children in regular class and other activities;
               and

    (6)    a statement of any individual appropriate
               accommodations that are necessary to
               measure the academic achievement and
               functional performance of the child.

20 U.S.C. § 1414(d).

       Obviously, the 2013 IEP was sadly deficient in satisfying the statutory
requirements, so it is understandable why DISD needed additional information about
Kelsey.

partially responsible for the delay in offering Kelsey a FAPE.  Therefore, the court concludes that DISD is only liable for retroactive reimbursement for eighteen weeks -- or one-half -- of Kelsey's Winston School tuition.

Lastly, DISD was not a party to the settlement agreement between LAUSD and Woody, and DISD had a right to reject the May 2013 LAUSD IEP.  WX 8 at 000618-24; JX 3 at 000304-26; 34 C.F.R. § 300.323(f).  Therefore, Woody is not entitled to reimbursement for Kelsey's transportation to and from school, nor is she entitled to the counseling services provided by the LAUSD IEP.

## IV.  CONCLUSION

For the reasons stated above, the decision of the independent hearing officer is **AFFIRMED** in part and **VACATED** in part.  Woody is entitled to judgment in her favor for $11,942.50.  Counsel for Woody is requested to submit, within ten days of this date, a proposed form of judgment in conformity with this memorandum of decision.

April 15, 2016.

_____
**A. JOE FISH**
**Senior United States District Judge**